ACCEPTED
06-14-00094-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
4/30/2015 2:33:41 PM
DEBBIE AUTREY
CLERK

# CASE NO. 06-14-00094-CV

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
4/30/2015 2:33:41 PM
DEBBIE AUTREY
Clerk

IN THE SIXTH COURT OF APPEALS
TEXARKANA, TEXAS

Nancy Bowman,
Appellant,

vs.

Jerry Davidson and
Diana Davidson
Appellees.

On Appeal from the 71st Judicial District
Harrison County, Texas
Cause No. 13-0618
The Honorable Brad Morin, Presiding

## BRIEF OF APPELLEES

ALAN E. BROWN
State Bar No. 03090500
BOYD & BROWN, P.C.
1215 Pruitt Place
Tyler, Texas 75703
903-526-9000
903-526-9001 Fax
aebrown@suddenlinkmail.com
ATTORNEY FOR APPELLEES

## ORAL ARGUMENT IS REQUESTED

# TABLE OF CONTENTS

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .....1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    BOWMAN IS NOT ENTITLED TO AFFIRMATIVE JURY FINDINGS AS A MATTER OF LAW ON THE STRICT LIABILITY SUBMISSION

    II.    THE NEGATIVE ANSWER TO STRICT LIABILITY IS SUPPORTED BY SUFFICIENT EVIDENCE................................3

    III.    BOWMAN IS NOT ENTITLED TO AFFIRMATIVE JURY FINDINGS AS A MATTER OF LAW ON STRICT LIABILITY CAUSATION

    IV.    THE TRIAL COURT PROPERLY ORDERED PLAINTIFFS TO PRODUCE PROOF OF OWNERSHIP OF ANY ANIMALS FOR WHICH PLAINTIFFS SEEK RECOVERY................................12

PRAYER................................12

CERTIFICATE OF COMPLIANCE................................13

CERTIFICATE OF SERVICE................................ 13

APPENDIX................................14

## INDEX OF AUTHORITIES

### CASES

*A&N Collision Ctr. of Addison, Inc. vs. Town of Addison,*
310 S.W. 3rd 191,193 (Tex.Civ.App.-Dallas 2010, no pet).................................................4

## STATEMENT REGARDING ORAL ARGUMENT

Appellees are of the opinion that oral argument would aid the Court in its analysis and evaluation of this record. Oral argument is therefore, hereby requested by Appellees.

## STATEMENT OF FACTS

Appellees lodge the following objections and disagreements to the following statements of fact contained in Appellant's Brief:

1. Appellant refers to a long time friend, Billy Strong, being "bitten" by Bubba. Appellees would show that neither Billy Strong nor the Davidsons considered that incident to be a bite, but merely a "nip". When questioned by appellant's counsel, Strong read from the statement he signed that the dog "nipped me on the back of my leg." Appendix Tab 1, 30:11-14; and 31:3-5. 4 RR, 94: 21-25. Diana testified the Bubba is very verbal when strangers come up and that he barks and jumps at the fence to give us the indication that someone is there. She has signs out saying 'Beware of Dogs', because she wants people to be aware of them. She goes on to state that Bubba has never bitten anybody. 4 RR 94:21-25.

2. Appellant states that when Bubba "bit" Strong, Diana had to holler at Bubba to turn Strong loose. Strong actually testified that he did not remember it as described by Diana in her testimony, but testified, "I know that's not what happened... the dog ran and he nipped me on the leg and that was it. He let it go". Appendix Tab 1, 45:17 through 46:9.

3. Bowman states that although the Davidsons do not always described the prior incident with Strong as a bite, Strong certainly does. Strong described the incident as a nip on multiple occasions. See references in No. 1 and 2 above.

-1-

4. Bowman states that the Davidsons put Bubba up when children come over because the children might get bit. Bubba is put up when children are around because they run around and heelers will tend to herd them. "Children don't tend to listen to you and they move real fast, and these are heelers."4 RR, 102: 13-14.

5. Bowman contends there was a "propensity" for Bubba to be dangerous, citing the testimony of Jerry. It is interesting to note that counsel for Bowman continues to use the term "propensity" when Jerry had already testified that he did not know the meaning of the word. 4 RR, 132:1-5.

6. Bowman referenced Jerry's testimony that he never knew when Bubba was going to "blow up". It should be noted that the term "blow up" was Bowman's counsel's terminology, not from the mouth of Jerry. 4 RR, 149:25 through 150:5.

7. Bowman contends that the Davidsons did nothing to properly train Bubba. The testimony was that Bubba had no formal training but in fact there was ample testimony that the Davidsons themselves had trained Bubba. 4 RR 98:20-23; 5 RR 149:10-12, and 5 RR 152:6-7.

## SUMMARY OF THE ARGUMENT

Bowman argues that the evidence established as a matter of law that Bubba had dangerous propensities abnormal to its class and that the Davidsons knew or should have known of such propensities. When the entire record is reviewed, just the contrary is actually established. That is, the only evidence in the record that possibly supports a finding argued by Bowman is that Bubba had nipped a family friend on the back of his leg on one occasion and that he barks and jumps at the fence when strangers approach the Davidsons' home. The overwhelming evidence presented at trial establishes that Bubba is a family pet that has never "bitten" anyone, nor have the Davidsons or any of their friends who testified at trial ever seen Bubba act in a dangerous or aggressive manner.

-2-

Perhaps the most telling summary of the evidence is contained in the testimony of Bowman's expert on dog behavior, Dr. Lori Haug. She agreed that there was nothing in her review of this case that even warranted the Davidsons giving the warnings they did. Dr. Haug believes that had any such evidence existed, it would have come out by the time the case was tried, at which she testified live.

If the evidence in totality establishes any fact as a matter of law, it would be that Bubba did not possess any dangerous propensities abnormal to its class of which the Davidsons knew or should have known. The Davidsons do not contest that Bubba did bite Bowman, but this incident was not anticipated nor foreseeable based on their knowledge as the owners of Bubba since he was a puppy.

The Davidsons' argument set forth below highlights the overwhelming amount of evidence which supports the jury's verdict, the judgment entered by the Court and it supports the Court's denial of Bowman's motion for new trial.

## ARGUMENT

I.      **Bowman is not entitled to affirmative jury findings as a matter of law on the strict liability submission, and;**
II.     **The negative answer to strict liability is supported by sufficient evidence.**

Bowman seeks a finding as a matter of law that there was no evidence to support the jury's finding of no strict liability under the Court's instructions and submission in Question 1. For a fact to be conclusively established, that is, found to be one as a matter of law, the evidence must be such that reasonable minds could not differ as to the conclusion to be

drawn from the evidence. See *A & N Collision Ctr. of Addison, Inc. vs. Town of Addison*, 310 S.W.3d 191, 193 (Tex.App.-Dallas, 2010, no pet.). Although Appellant cites numerous out of state cases, The Davidsons believe that the *Marshall* case and it's progeny accurately sets forth the law on strict liability as it relates to domestic animals.

A review of the entire record in this matter reveals overwhelming evidence that Bubba, the dog in question, had never exhibited any dangerous or vicious propensities. Throughout the trial, Bowman's counsel continually included the term "propensity" while questioning witnesses. It is obvious from the record as a whole, that there were no prior incidents involving Bubba that would have put a reasonable person on notice that there was any likelihood or any probability that Bubba would ever bite or attack anyone. Rather, the record reflects the opinions of most every witness who appeared  agree there is the "possibility"  for most any dog to bite under some circumstances. The Davidsons will address specific portions of the testimony which  provide ample evidence to support the jury's findings that Bubba did not have dangerous propensities abnormal to its class nor that the Davidsons knew or should have known of any such alleged dangerous propensities.

Bowman argues that the evidence conclusively establishes that Bubba was aggressive, protective and possessive. When asked specifically what aggressive meant to her, Diana Davidson (Diana herein) testified that if a stranger or anyone approaches, Bubba barks and he jumps at the gate. Diana calls his protectiveness "aggression" because he is protective of her. 5RR 154: 7-17. Diana had previously testified in response to knowing of the dogs

-4-

"aggression", she stated that he is very verbal when strangers approach. "He barks, jumps at the fence, and gives us the indication that someone is there." Diana has signs out because she wants people to be aware of the dog and states that the dog has never bitten anybody. 4RR 94: 20-25. The warning signs posted at the residence were not specifically for Bubba, but had been there for over 30 years. 4RR 111:18-22. Jerry Davidson's (Jerry herein) testimony confirmed that the warning signs had been present for 30-plus years, ever since they have lived there. 5RR 137:2-3. When asked when he first realized the dog was aggressive and protective, Jerry responded that he "never realized that the dog was aggressive, protective yes, but not aggressive". 4RR 130: 20-23.

Bowman's counsel continuously questioned Jerry about Bubba's "propensity". At one point, Jerry stated that he didn't even know the meaning of the word "propensity". 4RR 132: 4-5. Jerry later testified once again that the dog is not dangerous. 4RR 146: 6-10. When Jerry takes Bubba out of the yard to go anywhere, Bubba does not offer to bite anyone. 4RR 148: 23-24.

Bowman testified that Bubba had done nothing that concerned her until the bite occurred. 4RR, 62: 4-7. Bowman also agreed that Bubba seemed to act friendly towards her prior to the bite. 4RR 62: 9-12. Bowman further agrees that she was aware that all dogs can be dangerous and that there is potential for any dog to bite under certain circumstances. 4RR 64:20-25 and 65:1. Bowman saw no aggressive conduct on the part of Bubba nor saw anything to indicate Bubba's possessiveness. 4RR 67:2-13. Bowman testified that other than

the nip to Billy Strong, she has not heard anything that she could say was dangerous about Bubba. 4RR 79:14-16. After first testifying that she had heard other witnesses indicate Bubba had a tendency to bite, Bowman subsequently revised that testimony that she had only heard other witnesses testify as to Bubba's possessiveness. 4RR 79:25 though 80:5.

Bubba is not an outside dog but actually lives in the house with the Davidsons and outside. 4RR 89:8-13. Diana stated that Bubba has never bitten anybody. 4RR 94:25. The warnings given to visitors are not because of any history of the dog, but because Bubba is very protective of Diana and if he does not know someone, he will bark at them. These are warnings given with all of Diana's dogs. 4RR 95:13-18.

The Davidsons called several family friends who have been around Bubba on numerous occasions while in the Davidsons presence. Their testimony as to Bubba's conduct and personality is conduct that would have been observed by Diana and/or Jerry. The first witness was Judge Nancy George, Justice of the Peace, Precinct 4, Harrison County. 4RR 116:14-19. Judge George testified that Bubba had never been aggressive towards her and that she has never had any concerns about Bubba. 4RR 119:24-25 and 120:1-2. Judge George further testified that she has never been concerned that Bubba might bite anyone nor has Bubba ever done anything towards a human being that she would consider aggressive or inappropriate in any way. 4RR 124:11-14, 21-24.

A second family friend, Annette Squier, has never had any concerns about Bubba and has never seen him do anything that she thought was dangerous, vicious or anything like that.

Bubba has never acted adversely towards her in any way and she has never seen him act adverse to anyone in any way. 5RR 108:9-24. She stated that Bubba is always so friendly and is not vicious. 5RR 110:10-11. Squier told of her deceased husband and Bubba rolling around on the couch together. 5RR 110:13 through 111:1. Squier saw Bubba do nothing on the evening of the incident to indicate he did not like Bowman nor did he act out of the ordinary in any way. 5RR 111:11-17. Squier does not believe that there was any incident that caused the Davidsons to advise people of how to act around Bubba. 5RR 115:9-17.

The third family friend is Gladys Fant, who is the retired Chief Deputy of the Harrison County Tax Office. 5RR 120:21-22 and 121:12-19. Fant has never had any concerns about Bubba being aggressive towards her nor is she aware of Bubba ever biting anyone. She was told that Bubba "nipped" somebody but was not aware of that until after this case came up. 5RR 123:10-18. Also, in all of the times Fant has been around Bubba, she has never observed him act aggressively towards another person. 5RR 124:8-11.

Another friend, Sherry Rushing, testified that Bubba never acted adversely towards her, she never had any concerns about Bubba and never saw him act aggressively towards anyone. 5RR 129:3-13.

A fifth family friend, Anita Scott, testified that Bubba has never acted aggressively, viciously or abnormally towards her or anyone else. 5RR 135:15-21. On the night of the incident, Scott saw nothing about Bubba that was odd, different, inappropriate or that concerned her or made her think that Bubba should be put up. 5RR 139:3-9.

-7-

When Diana was called during Defendant's case in chief, she testified regarding a prior blue heeler that they owned, Maggie, that they kept up when anyone was over because she never warmed up to people. 5RR 150:2-16. Diana obviously appreciated the difference in the personalities of her dogs and took appropriate measures when the dog's conduct warranted such. Bubba was never muzzled and never offered to bite anyone. 5RR 149:4-7 and 150:20-25. The Davidsons do not even put a leash on Bubba when they take him out walking and that he is very docile outside of his own turf. It is that he is protective of his house and family. Bubba is absolutely not dangerous or vicious. 5RR 154:20 - 155:2-11 and 5RR 157:12-15.

Much is made in Bowman's brief of the prior "bite" involving Billy Strong. As previously referenced, Strong himself described the incident on more than one occasion in his testimony as being a "nip" or "being nipped" by Bubba. Strong had never observed Bubba being aggressive towards anyone. Appendix Tab 1, 14:17-22. On the night of the incident, he did not notice Bubba exhibiting any type of behavior that he would consider aggressive or showing anger or anything similar. Appendix Tab 1, 35:11-15. Nothing occurred the night of the incident that would have put anyone on notice that Bubba needed to be put up. Appendix Tab 1, 60:8-11. Strong had never known Bubba to bite, that is, get a hold of someone, before the time Bubba nipped him. Appendix Tab 1, 31:16-18. He testified that he believes he scared Bubba when he ran towards the door and Bubba simply reacted to him running. Appendix Tab 1, 42:18-23. After the nipping incident, Strong has had

-8-

no concern that Bubba might bite him again. Appendix Tab 1, 60:19-21. When the nip occurred, Diana did "fuss" at Bubba, according to Strong. Appendix Tab 1, 31:10-13. When Bowman's counsel attempted to put words in Strong's mouth as to his opinion that it was just a matter of time before this happened, Strong disagreed and indicated that he would not have thought anything like this would have happened. Appendix Tab 1, 62:16-19. Rather than the dangerous dog Bowman's counsel seeks to portray, Strong's description of his relationship with Bubba more accurately reflects Bubba's nature. That is, Strong states that when he goes to the Davidson's home, Bubba likes to see him, comes and jumps on him, which Strong calls being "Bubbatized". Appendix Tab 1, 54:9-25.

Bowman's dog behavior expert, Dr. Lori Haug, DVM, agreed that the nipping at the heel incident with Strong, or nipping at the heels in general, for herding dogs is second nature to them. 5RR 55:5-10. Dr.Haug also agreed that how the event occurred with Strong could have been that Bubba was startled, resulting in the nipping incident. 5RR 60:18-21.

As to the issue of the Davidson's knowledge of Bubba's nature, Dr. Bruce Bradley, DVM, Bubba's veterinarian, testified that a dog's owner is the best qualified person to know what that dog's behavior is going to be in a certain situation. Appendix Tab 3, 15:11-15. Dr. Bradley also stated that in all the times he had treated Bubba, he has no recollection nor is there anything in his records that indicate that Bubba was aggressive or threatening towards him or anyone else. Appendix Tab 3, 23:3-12.

Dr. Haug, testified that she was sure that the Davidsons never envisioned something

this serious happening, but rather only that something "may" happen, which was the basis for the warnings. 5RR 14:9-24. According to Dr. Haug, a dog's past behavior is an important predictor of what may happen in the future. 5RR 24:8-12. The only past behavior was the nipping incident with Strong and that Bubba barks and will jump at the fence when strangers come to the house. Haug further agrees that barking, or as she refers to it as "alarm barking", is not necessarily problematic. 5RR 29:10-12. Dr. Haug also testified that the Davidsons probably did not foresee this severity of a bite occurring. 5RR 57:19:20.

Although not related specifically to the Davidson' knowledge or foreseeing such an incident, Dr. Haug provides additional testimony which supports the jury's finding of no strict liability. When Dr. Haug was asked by Bowman's counsel what was her opinion on the ultimate question for the jury, she stated that she felt like the Davidsons did have adequate knowledge that something "may" happen. 5RR 14:8-10. The doctor's opinion falls far short of the threshold for forseeability of an event to occur, in that most anything may happen as opposed to an opinion based on probability, that is, what is probable or likely to occur. Dr. Haug's testimony is further weakened by her admission that there is a potential for most any dog to bite. 5RR 54:25 through 55:1. She found no evidence in this case that Bubba had ever bitten anyone other than the nip to Strong, no evidence that there was ever any threatening barking by Bubba, no evidence of Bubba ever lunging at anyone, no evidence that Bubba ever did anything aggressive, that is, snarled, bit, jumped on, hurt in any way any of the people when they were first exposed to the dog. 5RR 44:12-14, 45:9-12, 46:1-5, 47:8-

-10-

13.

Dr. Haug testified on Page 16, Line 8 of her deposition that up until the time of the bite to Bowman, she would not have considered Bubba to be a dangerous dog. 5RR 54:1-11. At trial, she changed, or at least modified, her testimony from a "no" answer as to whether Bubba was dangerous to "no with a qualifier". 5RR 54:11-23. This change of opinion in front of the jury allows the jury to accept or reject either opinion in their role as not only the fact finders, but in their capacity to evaluate the credibility of each witness. Dr. Haug testified about red flags or triggers indicating potential propensities. However, she admitted that the average dog owner cannot be expected to know how to assess these potential dangers. 5RR 59:3-19. She specifically agreed that the Davidsons certainly should not be held to the level of knowledge of someone like herself. 5RR 58:23-59:1. Finally, she admitted that there was nothing in the transcript or record of this case that she had seen that warranted the warnings regarding the Davidsons' dog. She stated that "you would think" any such evidence would have come out by the time this matter went to trial. 5RR 58:9-14.

Bowman has attempted to paint the picture that Bubba had no training and no "rules" but that the only rules were for the Davidsons guests. Diana testified that she has trained all of her dogs not to be that way (aggressive/possessive). 4RR 98:21-23. Diana's response to the nipping incident with Strong was to correct the dog. 4RR 99:21-23. When asked whether she or Jerry trained Bubba, Diana stated that she did. 5RR 149:10-12. Diana also trained Bubba with hand signals. 5RR 152:6-7.

These excerpts from the record provides more than sufficient evidence to not only create a fact question, thereby eliminating the matter of law point, but is clearly sufficient to support the jury's verdict.

**III.** **Bowman is not entitled to affirmative jury findings as a matter of law on the strict liability causation submission, and;**

**IV.** **The negative answer to causation is supported by sufficient evidence.**

The Davidsons do not contest that Bubba bit Bowman on the occasion in question. However, as set forth in the argument above, there is overwhelming evidence to support the jury's finding to the strict liability question (Appellant's Issue One). Appellees hereby adopt by reference, as if set forth herein in its entirety, the argument set forth in Argument I and II above. As instructed by the Court, the jury did not answer Question 2 based on their negative answer to Question 1.

In summary, the testimony clearly established a fact question as to whether Bubba had dangerous propensities abnormal to its class of which the Davidsons knew or should have known. The Davidsons presented not just "some evidence" on this issue, but an abundance of credible testimony in support the jury's verdict and the judgment entered in this cause.

### PRAYER

For the reasons set forth above, the Davidsons request that this Court affirm the jury's verdict and the Trial Court's judgment, and for such other and further relief, whether at law or in equity, to which they may show themselves justly entitled.

Respectfully submitted,

BOYD & BROWN, P.C.


BY:    /s/ Alan E. Brown
       ALAN E. BROWN
       State Bar No. 03090500
       1215 Pruitt Place
       Tyler, Texas 75703
       903/526-9000
       903/526-9001 (FAX)
       aebrown@suddenlinkmail.com
       ATTORNEY FOR APPELLEES

## CERTIFICATE OF COMPLIANCE

In compliance with TRAP 9.4(i)(3), counsel for Appellees certifies that the number of words in Appellees' brief is three thousand eight hundred twenty (3,820).

## CERTIFICATE OF SERVICE

I hereby certify that on this the 30 th day of April, 2015, a true and correct copy of the above and foregoing instrument was forwarded via electronic filing, Facsimile and/or E-mail, to:

Jack Sanders, Jr.
109 East Houston
P.O. Box 1387
Marshall, TX 75671-1387
Facsimile: (903) 938-8616
[ATTORNEY FOR APPELLANT]


       /s/ Alan E. Brown
       ALAN E. BROWN

-13-

# CASE NO. 06-14-00094-CV

IN THE SIXTH COURT OF APPEALS
TEXARKANA, TEXAS

Nancy Bowman,
Appellant,

vs.

Jerry Davidson and
Diana Davidson
Appellees.

On Appeal from the 71st Judicial District
Harrison County, Texas
Cause No. 13-0618
The Honorable Brad Morin, Presiding

**APPENDIX**

ALAN E. BROWN
State Bar No. 03090500
BOYD & BROWN, P.C.
1215 Pruitt Place
Tyler, Texas 75703
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
903-526-9001 Fax
aebrown@suddenlinkmail.com
ATTORNEY FOR APPELLEES

-14-

# APPENDIX TABLE OF CONTENTS

**DOCUMENTS**                                                                    **TAB**

Transcript excerpts Deposition of Billy Strong                                    1

Transcript excerpts Deposition of Bruce Bradley, DVM                              2

CAUSE NO. 13-0618

| | | |
|---|---|---|
| NANCY ELIZABETH BOWMAN, | ) | IN THE DISTRICT COURT OF |
|     Plaintiff, | ) | |
| | ) | |
| VS. | ) | HARRISON COUNTY, TEXAS |
| | ) | |
| JERRY DAVIDSON AND | ) | |
| DIANA DAVIDSON, | ) | |
|     Defendants. | ) | 71ST JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

BILLY STRONG

NOVEMBER 18, 2013

VOLUME 1 OF 1      ⎯ORIGINAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF BILLY STRONG, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 18th day of November, 2013 from 4:34 p.m. to 5:43 p.m., before Terri Lynn Smith, CSR in and for the State of Texas, reported by computerized stenotype machine, at the offices of Mr. Jack Sanders, Jr., 109 East Houston Street, Marshall, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.



EXHIBIT

nc.

Electronically signed by Terri Lynn Smith (601-237-608-4107)      16a5ed0f-8516-4c02-81cc-9c8298f78b4c

A P P E A R A N C E S

MR. JACK SANDERS, JR.
ATTORNEY AT LAW
109 East Houston Street
Marshall, Texas  75671
Telephone:  (903) 935-7172
Facsimile:  (903) 938-8616

    COUNSEL FOR PLAINTIFF:  Nancy Elizabeth Bowman


MR. ALAN E. BROWN
BOYD & BROWN, P.C.
1215 Pruitt Place
Tyler, Texas  75703
Telephone:  (903) 526-9000
Facsimile:  (903) 526-9001

    COUNSEL FOR DEFENDANTS:  Jerry Davidson and
                             Diana Davidson




ALSO PRESENT:  Mr. Dart Leigh, videographer
               Ms. Nancy Elizabeth Bowman

Electronically signed by Terri Lynn Smith (601-237-608-4107)                    16a5ed0f-8516-4c02-81cc-9c8298f78b4c

INDEX

                                                    PAGE

Appearances....................................    2

EXAMINATION

THE WITNESS:  BILLY STRONG

      Examination by Mr. Brown.....................    4

      Examination by Mr. Sanders...................   45

      Examination by Mr. Brown.....................   59

      Examination by Mr. Sanders...................   61

Reporter's Certificate...........................   64

EXHIBITS

NO.   DESCRIPTION                                  PAGE

4     Billy Strong's Handwritten Statement........   29

REPORTER'S NOTE

Quotation marks are used for clarity and do not
        necessarily indicate a direct quote.

Electronically signed by Terri Lynn Smith (601-237-608-4107)        16a5ed0f-8516-4c02-81cc-9c8298f78b4c

Q. And been in Harrison County ever since?

A. Ever since.

Q. All right. Married?

A. Yes.

Q. Okay.

A. Then.

Q. Okay.

A. Are you talking about now?

Q. Now are you married?

A. No.

Q. Okay. Have been married?

A. Yes.

Q. Okay. How long have you known the Davidsons?

A. Twenty-five years.

Q. Okay. Now, am I correct, did you sing or play in a band or singing group that Diana had at one time?

A. Yes; still do.

Q. Oh, okay. Is there a name of the group?

A. Southern Legacy.

Q. Okay. What -- do y'all do country, or what kind of music is it?

A. A lot of different kinds.

Q. Okay.

A. You have country, dance music, big band stuff --

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

Q. Does his wife work outside the home?

A. No.

Q. Okay. And so he's the only relative in the county?

A. Yes.

Q. Now, we're -- we're here today to take your deposition in regards to this lawsuit we have pending here in Harrison County that Ms. Bowman had brought against the Davidsons. You -- you understand that, correct?

A. Yes.

Q. And -- and you were present at the Davidson's home the night of this incident?

A. Yes.

Q. All right. I assume you had been at the Davidsons on occasions before this evening, get-togethers, eating dinner, that kind of thing?

A. Yes.

Q. Is that something y'all do fairly frequently?

A. Yes.

Q. Okay. Is it generally some -- sort of the same group or pretty much the same group that gets together over there?

A. Yes.

Q. Okay. Several of y'all live right there close

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

together, right?

A.    Yes.

Q.    Okay.    And y'all have been doing this for how long?

A.    Three years probably.    Yeah.    Actually, probably longer than that, but since we built that building back there, it's been about that long, so....

Q.    Okay.    And when you say "that building," you're talking about the little house right behind the --

A.    Yes.

Q.    -- Davidson's?

Call -- I think we've referred to it earlier in depositions like the music house?

A.    Yes.

Q.    Okay.    And is that a place where the four of the group there -- four in the group, would y'all practice, rehearse in that -- that room?

A.    Yes; and play.    We have parties over there sometimes.

Q.    Okay.    So it's big enough to perform and have a few people in?

A.    Yes.

Q.    Okay.    And you're familiar with the dogs owned by the Davidsons?

A.    Yes.

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

Q. Do you know how long they've had these -- the two dogs they have right now?

A. Ten years, I think.

Q. Now, you said you've --

A. That's --

Q. -- lived out there ten years. Were they there or --

A. Yeah. They came right after that. So it's been -- I was just -- I don't know how long -- old the dogs actually are. I've been there since they came, so....

Q. Okay. And have you had frequent occasions to be around their dogs?

A. Yes.

Q. Okay. There's one male, one female; is that right?

A. Yes.

Q. And is it your understanding they're brother and sister?

A. Yes.

Q. All right. And do you know the names of the dogs?

A. Yes.

Q. What are they?

A. Bubba and Sissy, or Dakota and Cheyenne,

Electronically signed by Terri Lynn Smith (601-237-608-4107)

16a5ed0f-8516-4c02-81cc-9c8298f78b4c

however you want to call them that.

Q. Okay. When you first started being around these dogs, did they ever, in any way, threaten you, or did you ever feel threatened or feel afraid around these dogs?

A. No.

Q. Okay. When you first started being around these dogs, did either Diana or Jerry ever sort of tell you, give you any instructions about being around the dogs or anything like that?

A. No.

Q. Okay. Had you been around them since they were fairly small?

A. Yes.

Q. So they've known you for a long time?

A. All their life.

Q. Okay. Had -- before the incident that our lawsuit is about, which occurred -- I believe our date is June the 24th of 2012, not quite a year and a half ago. Before that, had you ever observed either of the dogs being aggressive towards anyone?

A. No.

Q. Okay. Had you ever -- had you ever been at the house when, say, someone comes to the front door, maybe someone that's not in sort of the group that come by the

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

house often, had you ever been there when, like, a guest might come to the front door and observe the dogs, how they might react?

A. I don't know. Everybody goes to the back door.

Q. Okay. In other words, everybody that knows them?

A. Yes.

Q. Okay. In other words, everybody that knows the Davidsons, they just know you go to the back door?

A. Yes. Pretty much, yeah.

Q. Okay. Why? Why? Is that just where they're going to be or --

A. Yeah. Everybody's in the back --

Q. Okay.

A. -- so -- normally.

Q. How often are you over at the Davidson's house?

A. Two or three times a week.

Q. Okay. Do you always eat a meal when you go over?

A. No.

Q. Okay. What all would be the occasions that you're over, say that often?

A. Just visit.

Q. Okay. Do you consider them good friends?

A. Yes.

Electronically signed by Terri Lynn Smith (601-237-608-4107)

16a5ed0f-8516-4c02-81cc-9c8298f78b4c

period of time before y'all went into the house to eat, correct?

A. Yes.

Q. Give me your best estimate. How long do you think y'all were out just sort of playing, visiting, singing, whatever?

A. Maybe a hour and a half.

Q. Okay.

A. That's a guess.

Q. All right. For a while?

A. Yes.

Q. All right. Now, during that time frame, did you -- did you observe any interaction between Ms. Bowman and either one of the Davidson's dogs?

A. No.

Q. Okay. Did you -- did you make any -- first of all, do you remember talking directly to Ms. Bowman yourself while y'all were either in the music house or on the patio, in other words, out -- out -- out of the house?

A. Yes.

Q. Okay. Did -- did someone introduce you to her?

A. Well, yes.

Q. Okay. Was that Danny or someone else?

A. Yes, Danny.

Electronically signed by Terri Lynn Smith (601-237-608-4107)        16a5ed0f-8516-4c02-81cc-9c8298f78b4c

Q.    And do you remember who was next to Ms. Bowman?

A.    And that's, I think, Annette.  I can't remember if it was Annette or George.  I don't remember.

Q.    Okay.

A.    One of those two there.

Q.    That's fine.

A.    I was trying to....

Q.    How about Danny?  Do you remember where Danny was?

A.    I was thinking Danny was on the end, but that's where he always sits, but -- so it may not be that he was there.  It might just be my, you know, thinking that's where he was.

Q.    Danny often sits at the end to --

A.    At the end.

Q.    -- which would be to your right?

A.    Yes.

Q.    Okay.  But you're not sure?

A.    No.  I can't be absolutely positive about it.

Q.    All right.  Are you sure where Diana was?

A.    Yes.

Q.    And are you sure where Ms. Bowman was?

A.    Yes.

Q.    Okay.  Once y'all went inside the house, do you remember hearing any conversation with or directed to

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

Ms. Bowman about the dog, anything about feeding the dog from the table or anything like that?

A. I think I remember them saying not to feed the dog. Now, that's what I -- I think. I can't be positive about that either, though, but....

Q. Okay. Who -- who do you remember?

A. That would be Diana.

Q. Okay.

A. She would instruct us.

Q. Do you recall if Ms. Bowman had made any comment or asked Diana anything about feeding the dog?

A. No. I don't remember.

Q. Okay. When the bite occurred, how long had y'all been seated at the table?

A. Maybe 30 minutes, I'm -- I think. We had already been eating, so....

Q. Okay. Did you -- did you actually see when the bite occurred?

A. Yes.

Q. Okay. Tell us what you observed. What did you see?

A. Well, I saw the dog was sitting between Diana and Ms. Bowman, and she had turned to -- I don't know if she was feeding the dog or just looking at him. I don't know. But when she turned and -- and looked at him in

Electronically signed by Terri Lynn Smith (601-237-608-4107)

16a5ed0f-8516-4c02-81cc-9c8298f78b4c

the face, he jumped up and got her there.

Q. Okay. So could you actually see the dog --

A. Yes.

Q. -- part of the dog when -- when he bit?

A. Yes.

Q. Okay. Do you recall before the bite, I mean, was the dog making noise or doing anything, or was it just sort of out of the blue?

A. No. He was just sitting there.

Q. Now, you said Ms. Bowman leaned, what, in the direction of the dog?

A. Yes.

Q. Now, would that have -- so if the dog's between Ms. Bowman and Diana, that -- she was then leaning in the direction also of Diana?

A. Yes.

Q. Had the dog, Bubba -- when I say "the dog," we're, at this point, talking about Bubba. Okay? We understand that?

A. Yes.

Q. All right. Had Bubba bitten people, anybody before that you were aware of?

A. Yes.

Q. Okay. Who?

A. Me.

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

Q.    Okay.    Matter of fact, you wrote out a little statement about that, correct?

A.    Yes.

Q.    All right.    I'm going -- this is a co -- you -- you wrote this out yourself?

A.    No.

Q.    Or did you sign -- is that your --

A.    I signed it.

Q.    Okay.

A.    Okay.

Q.    Let me know show you.    This is Exhibit 4 that we've used today.    It's Exhibit 4 to Diana's deposition. Let me just show you a copy of that, and that's a statement that you -- you signed the bottom, correct?

A.    Yes.

(Exhibit 4 identified.)

Q.    (By Mr. Brown)    Okay.    Do you know who actually wrote out the statement?

A.    No.    I don't remember.

Q.    Okay.    What was the occasion that you signed this statement?

A.    I -- I was thinking -- I don't know.    Maybe Jack -- yes.    Okay.    I didn't know if this had come from on -- Mr. Sanders there or had asked me about what had happened.

Electronically signed by Terri Lynn Smith (601-237-608-4107)                    16a5ed0f-8516-4c02-81cc-9c8298f78b4c

Q. Okay.

A. Okay. That's when I signed it.

Q. So -- so you told Jack or someone in his office --

A. Yes.

Q. -- about what happened, and somebody wrote it out and then you signed it saying, Yeah, that's --

A. Yes.

Q. -- that's what happened?

A. Yes.

Q. Okay. Okay. Now, when it says that -- what does it say? It says, I was bitten or the dog bit me. What's the language there?

A. "Nipped me on the back of my leg."

Q. Okay. Do you remember the occasion, sort of what -- I mean, were you just sitting around or can you -- do you remember what was happening that the dog did that?

A. Yes.

Q. What -- tell us -- tell us what occurred.

A. They had had a repairman there to work on their heater, and he had gotten up and left and forgot his bag of tools and was out in his car fixing to leave, and Diana asked me to take the bag of tools out. So I grabbed the tools and I took off at a trot towards the

Electronically signed by Terri Lynn Smith (601-237-608-4107)

16a5ed0f-8516-4c02-81cc-9c8298f78b4c

front door, and Bubba got me.

Q. Okay.

A. He nipped me on the back of the leg.

Q. All right. Did -- did it break the skin?

A. No.

Q. Okay. Just left a red mark or --

A. Yeah; bruised, but....

Q. Okay. Did you seek any medical attention?

A. No.

Q. Okay. Do you remember when he did that, did Diana respond? Did she holler at the dog or anything? Do you remember?

A. Yes. She fussed at him.

Q. Okay. Other than that occurrence -- well, let me strike that.

Had you ever known Bubba to do that, actually, you know, bite, get ahold of somebody before?

A. No.

Q. Had you ever observed Bubba out working, messing with the cows?

A. Not really, no.

Q. Okay.

A. He doesn't go out there much.

Q. Okay. Now, do you know what breed of dog Bubba is?

Electronically signed by Terri Lynn Smith (601-237-608-4107)     16a5ed0f-8516-4c02-81cc-9c8298f78b4c

A. Yes.

Q. What is it?

A. Blue heeler.

Q. Do you know much about blue heelers?

A. I just know how protective they are, and they like to herd things, but, you know.

Q. Okay.

A. I've got a red heeler. That's why I know.

Q. So are they sort of kin to each other?

A. A little.

Q. Is a red heeler, are they also a herding dog?

A. Yes.

Q. Okay. Do you know, does your dog have sort of the same characteristics or tendencies of herding and doing things like nipping heels of animals, cattle, whatever, to herd?

A. Yes.

Q. Okay. Ever had any problems with your dog biting people?

A. No.

Q. Okay. So other than the occasion when Bubba grabbed you when you were trotting through the -- you were in, what, in their living room area?

A. Yes.

Q. Heading to the front door?

Electronically signed by Terri Lynn Smith (601-237-608-4107)    16a5ed0f-8516-4c02-81cc-9c8298f78b4c

and they don't want anything to happen to them or something like that. That's....

Q. On the evening of this event, do you remember anything being said by anybody about, you know, do you want us to put the dogs up, or why don't we put the dogs up, or should we put the dogs up? Any comment like that. Do you remember --

A. No.

Q. -- anything like that being said?

A. No.

Q. Okay. Did -- before the bite that evening, did Bubba ever exhibit any type of behavior that you would call aggressive or showing anger or aggression, anything like that?

A. No.

Q. So had anything occurred that evening that you believe would have put a reasonable person on notice that, you know, the dog's, you know, not liking the new person that's here or anything like that?

A. Not that I remember, no.

Q. Okay. Have you -- have you talked to Danny Alexander since this incident?

A. Yes.

Q. About -- about what happened?

A. About this incident? No.

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

know, I'm thinking, well, he nipped me, you know.

Q. He might get somebody else?

A. Yeah. He might get somebody. I've known him, you know, since he was brought there, a puppy, so....

Q. How long was it from the time when he nipped you until he bit Ms. Bowman?

A. Maybe a year.

Q. Okay.

A. That's a guess.

Q. In that year or so, did any -- was there any other incident, anything else happen that made you any more concerned or was that sort of it?

A. No. That was it.

Q. Okay. Did Diana ever say anything to you after he bit you that she was more concerned or anything or --

A. No.

Q. Okay. Does the -- does Bubba respond to Diana? In other words, if Diana gives him a command or whatever, does the dog respond to Diana?

A. Yes.

Q. How about to Jerry?

A. Yes.

Q. Equally the same or more one than the other?

A. I don't -- I couldn't tell you that.

Q. Okay.

Electronically signed by Terri Lynn Smith (601-237-608-4107)     16a5ed0f-8516-4c02-81cc-9c8298f78b4c

was mean.

Q. Okay. Had that dog bitten people before? Do you know if it had?

A. I -- I don't know.

Q. Okay. But they would even put it up when people they knew, sort of some of these regular group --

A. Yes.

Q. -- were over?

A. Yes.

Q. Okay. After the dog nipped at you, were -- when you would go -- after that, when you would go back to the Davidsons, were the dogs still out when you'd go back on other occasions?

A. Yes.

Q. Okay. And you didn't have any more problems with Bubba after that?

A. No.

Q. Okay. Why do you think he nipped that -- that particular time?

A. I think that I had -- I don't know. I'm going to say scared him because I was running towards the door, you know. I don't know if it was a surprise thing or what, but he didn't like me running towards the door, so....

Q. Okay. Had -- had you come through the living

Electronically signed by Terri Lynn Smith (601-237-608-4107)     16a5ed0f-8516-4c02-81cc-9c8298f78b4c

p.m.

(Break from 5:17 p.m. to 5:19 p.m.)

THE VIDEOGRAPHER:  We're back on the record at 5:19 p.m.

EXAMINATION

BY MR. SANDERS:

Q.    Mr. Strong, my name's Jack Sanders, and I represent Ms. Bowman.  And to clarify, I came to see you, and you told me what happened, I wrote it down, and then you made some corrections, I think, where you initialed it and you signed that; is that correct?

A.    Yes.

Q.    Your statement.  We're talking about No. --

A.    That 4.

Q.    -- No. 4?

A.    Yes.

Q.    All right, sir.  Now, I have previously taken the deposition of Mrs. Davidson this morning, and we've talked about the bite that's mentioned there in Exhibit No. 4, and she says that she witnessed that -- that bite.  Is that your recollection --

A.    Yes.

Q.    -- when the dog attacked you -- or bit you?

A.    Yes.

Q.    And I believe she described it as she had to

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

call the dog off, he had ahold of your pants leg and wouldn't let go and was shaking. Do you recall that?

A. No.

Q. All right. You just don't recall it, but you don't --

A. No. I know that's not what happened.

Q. Okay. What happened?

A. The dog ran and he nipped me on the leg and that was it. He let it go.

Q. Okay. But it was enough bite to cause a bruise?

A. Yes.

Q. Okay. Now, then, how long was it -- you said that the dogs -- excuse me. You said that the Davidsons had a blue heeler before Bubba that was just plain mean, as I think you've described it; is that correct?

A. Yes.

Q. How long was it from when they had the dog that was mean, was it -- did he agress -- did -- did the dog progressively get mean as he got older?

A. That dog was old whenever I came around them, when I met them.

Q. Okay.

A. It was already -- had been there, so....

Q. Do you know whether or not dogs, as they get

Electronically signed by Terri Lynn Smith (601-237-608-4107)

16a5ed0f-8516-4c02-81cc-9c8298f78b4c

A.   I don't recall.

Q.   All right.  Could it -- this leaning, could it very well have been that Ms. Bowman reached over to say something to Ms. Davidson?

A.   I -- I don't know.

Q.   Okay.  Or it could have been -- it wasn't that Ms. -- or was it that Ms. Bowman reached down in the face of the dog, or was it just that Ms. Bowman leaned to the right toward Ms. -- Ms. Davidson?

A.   I -- I don't --

Q.   You don't know?

A.   I don't know the reason.

Q.   All right.

A.   No, I don't.

Q.   But was it like the dog had to leave its feet to hit her -- to be able the grab her in the face?

A.   As in --

Q.   Well, here.

A.   Are you talking about jump or just whack, you know, because that's --

Q.   No.  Did the dog have to leap any to be able to get her in the face?

A.   No.

Q.   Okay.  How tall is the dog?

A.   The dog's about -- about this tall.

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

doing?

A.  I don't know.

Q.  Okay.

A.  I don't know if she was just eating or -- I couldn't -- I don't -- I don't know.

Q.  All right.  And did you hear Ms. Davidson make any statements to Ms. Bowman right before the attack?

A.  I don't recall that.

Q.  All right.  Has anyone else told you that they saw the attack?

A.  No.

Q.  All right.  And I'm told that -- well, Mr. Davidson stated that he warned Ms. Bowman and, therefore, he wasn't liable that -- well, let me ask you this:  Do you think that the warn -- that Mrs. -- if Ms. Bowman failed to heed the warnings, that was the cause of this attack?

A.  Yes.

Q.  How is that?

A.  Well, if she was warned, like then went ahead and did it anyway, then, you know....

Q.  But you don't know --

A.  I don't know that she was warned.  Okay?  I just know that's the way it always has been before, so....

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

Q. And you don't know whether she was leaning down to look at the dog or whether she was leaning over to talk to Ms. Davidson either?

A. No. I have no idea about that.

Q. Could be either one, from what you saw?

A. Yes.

Q. And has there ever been an occasion that -- strike that.

Has the dog ever come up for you to pet him?

A. Yes.

Q. And did you pet him?

A. Yes.

Q. Okay. You weren't scared to pet him?

A. No.

Q. Why is that? Because you were raised around him?

A. Yes.

Q. Or vice versa?

A. Yes. He'll -- he meets me when I come. You can hear him hollering and here he comes. And he -- I say I get Bubbatized because he leaps on me.

Q. Well --

A. Not bite me. Just leaps on me and, boom, you know. Yeah. He likes to see me come.

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

Q.   Is it fair -- is it fair to say at times Bubba can be ill-tempered?

A.   I would say so, yes.

Q.   All right.  And he's, at times, exhibited dangerous characteristics?

A.   Well, he has with Ms. Bowman, yes.

Q.   Before that he attacked you, did he not?

A.   Well --

Q.   Attacked your leg or bit your leg?

A.   Yeah.  He nipped my leg.

Q.   All right.  And do you know what Mrs. Davidson's reaction to that was?  Did she --

A.   Yes.  She scolded the dog and....

Q.   Scolded him?

A.   Yeah.  She scolded him.

MR. SANDERS:  We're going to change tapes here.

THE VIDEOGRAPHER:  End of Tape 1.  Off the record, 5:32 p.m.

(Break, 5:32 p.m. to 5:34 p.m.)

THE VIDEOGRAPHER:  Beginning of Tape 2.  Back on the record, 5:34 p.m.

Q.   (By Mr. Sanders)  Now, back to two things.  One, the prior dog that was just -- I think you said he was mean and they put him up.  Did they -- were you

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

would have happened?

A. Yes.

Q. Right. Okay. But that evening do you recall any -- anybody raising any concern or the issue of putting the dog up that particular evening?

A. No. I don't -- I don't recall them saying put the dog up.

Q. And you observed nothing that you felt like would have put anyone on notice that, Hey, we better put the dog up because he's acting a certain way tonight?

A. No.

Q. Okay. And the dog's been out there a lot of times when you've been over there since this happened, right?

A. Yes.

Q. And you've never asked them to put the dog up when you've been over there, have you?

A. No.

Q. Okay. You haven't been concerned that he's going to bite you again or anything?

A. No.

Q. Okay. I mean, he could, right?

A. Yeah. He could, but --

Q. Okay. In other words, that's like what you said earlier about saying the dog's dangerous. Once he

Electronically signed by Terri Lynn Smith (601-237-608-4107)          16a5ed0f-8516-4c02-81cc-9c8298f78b4c

bit you, obviously he bit at you, he might bite somebody else, right?

A. Yes.

Q. Okay. But you're still around the dog fairly frequently and have no real concerns about him attacking or biting you?

A. No. When Diana and Jerry leave to go -- or if they're going to go out of town, they call me, and I go over there and let the dogs out and all that stuff, so it's....

Q. Okay.

A. I have no concern about him biting me.

Q. So the -- am I correct that the only real thing that sort of changed since Ms. Bowman has been bitten is that now when new people or guests come over, they -- they put the dog up?

A. Yes.

Q. Because of what now has happened?

A. Yes.

MR. BROWN: Okay. All right. Okay. Thank you I pass the witness.

(Examination concluded at 5:40 p.m.)

EXAMINATION

BY MR. SANDERS:

Q. You say that on that particular night there was

Electronically signed by Terri Lynn Smith (601-237-608-4107)                    16a5ed0f-8516-4c02-81cc-9c8298f78b4c

no -- no sense of their dog acting any different than he normally does; is that correct?

A. Correct.

Q. All right. But that night there were the warnings there, the same warnings that they always give because the dog has this dangerous propensity to attack because of the possessiveness and -- not possessiveness, protectiveness and aggression. Is that a fair statement?

A. Yes.

Q. That danger that -- the warnings and rules and regulations that were told to Ms. Bowman, that danger remains regardless of the actions of the dog or nonactions of the dog, correct?

A. Yes.

Q. And it was just a -- in your opinion, was it just a matter of time before this happened?

A. I don't know. I wouldn't have thought that that would have happened like that anyway, but....

Q. But that was the reason for the warnings?

A. Yes.

Q. What happened to the dog that you claim was just mean? Did he die of old age or --

A. I think -- I think it was a female, and I think she just died of old age. That was quite a few years

Electronically signed by Terri Lynn Smith (601-237-608-4107)                    16a5ed0f-8516-4c02-81cc-9c8298f78b4c

CAUSE NO. 13-0618

| | | |
|---|---|---|
| NANCY ELIZABETH BOWMAN,<br>    Plaintiff, | ) | IN THE DISTRICT COURT OF |
| | ) | |
| VS. | ) | HARRISON COUNTY, TEXAS |
| | ) | |
| JERRY DAVIDSON AND<br>DIANA DAVIDSON,<br>    Defendants. | )<br>)<br>) | 71ST JUDICIAL DISTRICT |

REPORTER'S CERTIFICATION
DEPOSITION OF BILLY STRONG
NOVEMBER 18, 2012

I, TERRI LYNN SMITH, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, BILLY STRONG, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That examination and signature of the witness to the deposition transcript was waived by the witness and agreement of the parties at the time of the deposition;

That the original deposition was delivered to Mr. Alan E. Brown;

That the amount of time used by each party at the deposition is as follows:

Mr. Jack Sanders, Jr. - 00 hours, 20 minutes

Mr. Alan E. Brown    - 00 hours, 45 minutes

Deposition Resources, Inc.
800.295.4109

That $ _297.60 is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Mr. Jack Sanders, Jr., Attorney for Plaintiff, Nancy Elizabeth Bowman;

Mr. Alan E. Brown, Attorney for Defendants, Jerry Davidson and Diana Davidson.

That a copy of this certificate was served on all parties shown herein on 11/26/2013 and filed with the Clerk pursuant to Rule 203.3.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified on this the 25th day of November, 2013.

TERRI LYNN SMITH, Texas CSR
Expiration Date: 12/31/14
Deposition Resources, Inc.
Firm Registration No.: 409
515 North Church Street
Palestine, Texas 75801
Telephone: (903) 729-3289
Facsimile: (903) 727-0986

Electronically signed by Terri Lynn Smith (601-237-608-4107)        16a5ed0f-8516-4c02-81cc-9c8298f78b4c

NO. 13-0618

| NANCY ELIZABETH BOWMAN | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| V. | § | 71ST JUDICIAL DISTRICT |
| | § | |
| JERRY DAVIDSON and | § | |
| DIANA DAVIDSON | § | |
| Defendants. | § | OF HARRISON COUNTY, TEXAS |

VIDEOTAPED/ORAL DEPOSITION OF
BRUCE BRADLEY, D.V.M.
MARCH 13, 2014

VIDEOTAPED/ORAL DEPOSITION OF BRUCE BRADLEY, D.V.M., produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and -numbered cause on the 13th day of March, 2014, from 4:21 p.m. until 4:50 p.m., before Amanda J. Leigh, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the Law Office of Jack Sanders, Jr., 109 East Houston, Marshall, Texas 75671, pursuant to the Texas Rules of Civil Procedure and the agreement(s) hereinafter set forth, if any.

EXHIBIT
Q

A P P E A R A N C E S

FOR THE PLAINTIFF:

    Jack Sanders, Jr., Esq.
    LAW OFFICE OF JACK SANDERS, JR.
    109 East Houston
    Marshall, Texas 75670
    Telephone: 903-925-7172

FOR THE DEFENDANTS:

    Alan E. Brown, Esq.
    BOYD & BROWN, P.C.
    1215 Pruitt Place
    Tyler, Texas 75703
    Telephone: 903-526-9000

ALSO PRESENT:

    Mr. Dart Leigh, Videographer

INDEX

WITNESS:  BRUCE BRADLEY, D.V.M.

Examination by Mr. Sanders........................... 4
Examination by Mr. Brown............................ 16
Further Examination by Mr. Sanders.................. 26
Further Examination by Mr. Brown................... 29


Changes and Signature.............................. 34
Court Reporter's Certificates...................... 36


(No exhibits marked.)

A.    Yes.

Q.    And are you going to refer to Dr. Haug as to whether Bubba has any propensities to be dangerous --

A.    Yes --

Q.    -- or --

A.    -- I would, because there's two things about it is, is that -- an animal in my office does not always act like that's the same animal at home, and that can go either way.  They can be docile at home and vicious in my office or vice versa.

Q.    There again, the owner of the dog is the best-qualified person to know what that dog's behavior is going to be in a certain situation.  Is that correct?

A.    That would be my opinion.

Q.    All right.

And if a dog, in your opinion, has shown aggressive tendencies at one time, what should the -- in your opinion, the land -- the home -- the dog owner do in regard to that dog showing those aggressive tendencies?

A.    In my opinion, you know, if somebody has an aggressive dog--and just -- and this'd just be me--that I would be sure, if I was going to have people over, I'd probably put the dog up, away from the people,

yeah.

Q.    All right, sir.

What about -- never mind.  Strike that.

MR. SANDERS:  I -- I pass the witness.

EXAMINATION

BY MR. BROWN:

Q.    Okay.  Dr. Bradley, I'm Alan Brown.  You and I have met before.  I came up to your office --

A.    Yep.

Q.    -- a month or so ago, I guess, now --

A.    Yeah.

Q.    -- and just chatted with you a little bit about --

A.    Yes.

Q.    -- this case.

Now, you've been asked some questions about the plaintiff's expert, the person they've hired to give opinions, Dr. Haug.  Do you know whether or not Dr. Haug has ever been around this particular dog, around Bubba?

A.    No, I do not know.

Q.    Okay.  So as between her and yourself, if she has not, then, obviously, you have some perspective that she would not have because you've actually treated, been around, handled this dog, correct?

A.    Correct.

Q.    Okay.

And I think you -- I think --
Mr. Sanders just asked you a question that I was
wanting to ask, and I want to make sure that's what he
said and you agreed to it, and that is that -- that the
best person to really know the character or the
behavior of a dog in terms of how they act in certain
locations or in certain situations, such as just the
family versus a big group, all of that, the best person
that would know that dog would be the owner of that
dog.  Is that correct?

A.    I would think so.  Just like I told
Mr. Sanders, yes, that they're around the dog most the
time, so normally they know the -- the behavior of the
dog in all situations.

Q.    Okay.  And I think -- again, I think it's not
contested, that Bubba, he's about 11 or 12 years old,
and that the Davidsons got him and the other--I think
it's his sister, the other dog they have--at the same
time and that these dogs have lived in the home with
the Davidsons ever since they were puppies.

It -- did you have that understanding
before you came today, that they were -- they've been
raised all their lives by the Davidsons and --

that I -- you know, they -- they shouldn't. And I'm not going to say some of them -- but most heelers I see, no. They might nip at a -- a cow or a horse, but they don't nip at people.

Q. Okay. Again, that goes to the level of training --

A. That goes -- yes.

Q. So they may have the natural tendency to want to have that herding instinct.

A. Well --

Q. Correct?

A. -- I would -- yes.

Q. And so then it may simply be a level of training, as to, okay, it's okay to go nip our cows out here, but don't herd the people. Correct?

A. In my opinion.

Q. Okay.

A. That's just my opinion. Again, like I say, here's the experts over here that can --

Q. Okay.

A. -- that can go further, so....

Q. Now, let -- you -- I think when we visited, you told me your last recollection of seeing Bubba--I think you were looking at the records--

A. Yep.

Q.    --you had given him a shot of some kind.

A.    I'd pulled blood.  I'd --

Q.    Pulled --

A.    -- taken --

Q.    -- blood.

A.    -- a blood sample.

Q.    Okay.

And you told me that a matter of weeks or something before that --

A.    Yeah.

Q.    -- you had gone through some health issues, yourself.  Heart -- was it a heart --

A.    Open heart surgery.

Q.    Surgery.

A.    That's right.

And I told you if the dog would have been aggressive that day, I would not have pulled blood, because I was about -- my chest was still not healed.  I mean, the surgery's done on September the 29th and I think these records show it was November the 11th or somewhere in early November, so --

Q.    Okay.  So --

A.    -- yes --

Q.    -- if he was giving you any concerns, you wouldn't have been drawing blood from him.

A.    That -- that is correct.

Q.    Okay.

Do you have -- from the times that you have seen Bubba, treated him, do you have any recollection or is there anything in your records that you've seen that indicates that he was aggressive towards you or threatening towards you or anyone else?

A.    No.  There's nothing in the records to that effect.

Q.    And do you have any memory of anything like that?

A.    No.

Q.    Okay.

If Bubba -- if the facts are such that the only thing that Bubba had ever done that would be considered aggressive or a bite or attacking, or anything like that, was the incident where he went after Billy Strong and got him on the back of the heel, the leg, if that was the only -- if that, in fact, is the only incident of aggression by this dog--all of his other activity has not shown aggression, he hadn't bitten anybody else, he -- he's always out when they have -- generally out when they have groups of friends over at the house--if those are the facts, do you believe that the Davidsons would be the best ones to

at what point they are to take responsibility for their dog.

A.   As I said earlier, I think that if I have a dog or you have a dog, that the responsibility's always ultimately upon you.  I mean, that is my thought, if common sense counts, but --

Q.   All right.  Don't leave it to somebody else.

(Reporter clarification.)

MR. SANDERS:  I don't think he did.

I'll pass the witness.

FURTHER EXAMINATION

BY MR. BROWN:

Q.   That last time you saw Bubba and you gave him the shot --

A.   Yep.

Q.   -- do you remember him being muzzled that day?

A.   I do not remember it.

Q.   Okay.  Because my memory of when I met with you was that you made the comment that -- that in giving him a shot, where -- where do you give him the shot?

A.   Oh, well, we're pulling out of his -- out of his forward leg.

Q.   Okay, front -- one of his front legs.

A.   One of his front legs.

Q.   And I think you told me when you do that, you're not far from his mouth.

A.   That is true.

Q.   Okay.

And I think you told me that if you had had any concerns about that dog, you wouldn't have been doing that.  Do you remember telling --

A.   I --

Q.   -- me --

A.   -- did.

Q.   -- something -- okay.

A.   Yes, I did.  Said that day, if -- if I -- I had been out of surgery not long.  If I'd had any concerns, that -- that I would not have done it.

Q.   And, of course, if the dog had been muzzled, he obviously couldn't have bitten you.

A.   No, he couldn't have bitten me.

Q.   He still might have jumped or something --

A.   He still could have jumped, though --

Q.   Okay --

A.   -- is what I'm --

Q.   -- okay.

A.   -- saying.

Q.   All right.

NO. 13-0618

NANCY ELIZABETH BOWMAN        §   IN THE DISTRICT COURT
        Plaintiff,            §
                              §
V.                            §   71ST JUDICIAL DISTRICT
                              §
JERRY DAVIDSON and            §
DIANA DAVIDSON                §
        Defendants.           §   OF HARRISON COUNTY, TEXAS

REPORTER'S CERTIFICATE TO THE
VIDEOTAPED/ORAL DEPOSITION OF BRUCE BRADLEY, D.V.M.
MARCH 13, 2014

I, Amanda J. Leigh, Certified Shorthand Reporter in and for the State of Texas, hereby certify:

That the witness, BRUCE BRADLEY, D.V.M., was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

That witness waived signature;

That $525.50 is the deposition officer's charges to counsel for the Plaintiff, for preparing the original deposition and any copies of exhibits;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount of time used by each party at the time of the deposition: